1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  GREGORY A. OTT
   Deputy Attorney General
5  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
6  State Bar No. 117315
    455 Golden Gate Avenue, Suite 11000
7   San Francisco, CA 94102-7004
    Telephone: (415) 703-1362
8   Fax: (415) 703-1234
    Email: peggy.ruffra@doj.ca.gov
9  Attorneys for Respondent

10                IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

**CARISHA CAREE LIBBETT,**            C 07-2884 SI

                        Petitioner,    **MEMORANDUM OF POINTS AND**
                                       **AUTHORITIES IN SUPPORT OF**
            v.                         **ANSWER**

**LINDA CONDRON, Warden,**

                        Respondent.

## STATEMENT OF THE CASE

Following a joint trial of petitioner Carisha Caree Libbett and codefendant Leon Harvey by a Santa Clara County jury, petitioner was convicted of three counts of robbery, kidnapping to commit robbery, and a lesser included offense of misdemeanor assault. The jury found not true an allegation that petitioner was armed during the robbery and kidnapping. CT 210-223. The trial court sentenced petitioner to life with possibility of parole, plus four years. CT 317-319.

On November 14, 2006, the California Court of Appeal affirmed the judgment of conviction. Exh. 6. On February 7, 2007, the California Supreme Court denied review. Exh. 9

On June 4, 2007, petitioner arrived in federal court.

# STATEMENT OF FACTS

## A.  Chavez Robbery

On September 17, 2004, at 4:30 a.m., Luis Chavez was driving to work when he saw petitioner Libbett standing in front of an apartment at 625 South 2nd Street in San Jose. (3RT 412-416.) She waved at Chavez to solicit him for prostitution and he agreed to pay $60. (*Id.*) Chavez then drove her to a nearby ATM where he withdrew $60 and returned to the apartment. (3RT 416-417.) Libbett spoke to someone in a black Chevrolet Suburban that was also parked in front of the apartment, then she and Chavez entered the apartment. (3RT 420-422, 427.)

Libbett told Chavez that she lived in the apartments. (3RT 420, 427.) Libbett and codefendant Leon Harvey had been tenants there for four and a half months, but had vacated their unit on August 31, 2004. (3RT 398, 400.) When they vacated the building, they returned all of the keys except Harvey's front door key, which he said he had lost. (3RT 401.) The apartment is a five unit building with private bedroom areas and shared bathrooms and kitchen on the second floor. (3RT 396.) There were two shared bathrooms, one on the left toward the front of the house and one in the rear of the house. (3RT 398-399.)

Libbett took Chavez into the apartment without using a key and directed him upstairs to the bathroom on the left where she had him sit in a chair. (3RT 427-430.) She locked the door and Chavez gave her the $60. (3RT 431, 433.) A minute or two later, there was a knock at the door, Libbett opened the door, and Harvey rushed in. (3RT 431.) Harvey told Chavez to, "stay right there, don't move" and started reaching into his clothes for something. (3RT 436.) Libbett told Harvey to, "put the gun back, put the gun back." (*Id.*) Chavez saw something black and square in Harvey's hand but did not get a good look at it. (*Id.*) Harvey told Chavez that he would shoot him if he moved and ordered Chavez to give him all of his money. (3RT 707.) Chavez did what he was told and was afraid that it could be his "last day." (3RT 438.)

Harvey took Chavez's wallet and, upon discovering that it only had $3, told Chavez that it was not enough and that they were going back to the ATM to withdraw more money. (3RT 439-440.) They all left the bathroom, walked down the stairs, and out of the apartment building. (3RT 441.) Chavez was walking ahead of defendants. Harvey told Chavez, "Don't try to do nothing,

because you are going to get hurt." (3RT 442.) Chavez stated that he was not very concerned about getting hurt, he "was more concerned about getting killed." (*Ibid.*)

The distance from the bathroom to Chavez's car in front of the apartment was between 50 to 100 feet. (3RT 444; 4RT 555-557.) While walking, Chavez was praying and trying to decide whether or not to try to escape. (3RT 444.) Harvey had Chavez let him into the passenger side of the car. While walking around toward the driver's side, Chavez saw a white SUV approaching. (*Id.*) Chavez was still afraid he might get shot, but decided to take the risk and ran up to the white SUV for help. (3RT 445-446.) When defendants appellants saw that the SUV stopped, they looked at Chavez for a moment, then ran. (3RT 444-445.)

**B.   Lopez Robbery**

On September, 23, 2004, at 6:30 a.m., Phillip Lopez was driving to work on Margaret Street near 2nd Street when he saw Libbett and agreed to pay her $40 for sex. (2RT 284-287, 290-291.) She got in the car and directed him to a nearby parking lot. After they stopped in the lot, Lopez felt something metallic and cold on the back of his neck that he thought was a gun. (2RT 294-295.) A male voice said, "Don't look around and give me your keys." (2RT 295.) Libbett said, "Oh my God, Oh my God," in an un-genuine way and ran away. (2RT 296.) Lopez handed the man his keys and wallet. (2RT 297.) After the man ran off, Lopez heard a car door close, then saw a black Chevrolet Suburban driving away. (2RT 303.)

**C.   Plancarte Robbery**

On September 25, 2004, at 9:00 a.m., Jose Plancarte was driving on Margaret near 2nd Street, when Libbett got into his car and asked him if he wanted to pay for some sex. Plancarte agreed and she directed him to a nearby parking lot. (2RT 94-97.) After they stopped in the lot, Plancarte was hit in the head with a flashlight through the open window. (2RT 98-99.) Libbett exited the car and hit Plancarte with the door when he tried to follow her. (2RT 99-100.) Harvey dragged Plancarte out of the car with the flashlight held to his neck. He then hit Plancarte 25 times on his head, face, hands, and leg while pulling money out of his pockets. (2RT 101-103.) After the

robbery, Libbett pulled up in a black Chevrolet Blazer (license plate beginning in "S20"), picked up Harvey, and drove away. (2RT 106-109.) Plancarte had seven $100 bills, four $20 bills, one $10 bill, ten $5 bills, and four $1 bills taken from him. (2RT 105-106.)

Defendants were arrested at the Townhouse Motel where the black Chevrolet Suburban was found, shortly after the robbery. (2RT 190-191, 207-208.) The manager reported that the same day, Libbett had paid $322 in rent, including three $100 dollar bills. (2RT 205-207, 252-254.) When Libbett was booked, $472 in cash was found in her underwear, including four $100 bills. (2RT 208-209.)

## STANDARD OF REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes a "highly deferential" standard for evaluating state court rulings and "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). Under AEDPA, the federal court has no authority to grant habeas relief unless the state court's ruling was "contrary to, or involved an unreasonable application of," clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). A decision constitutes an unreasonable application of Supreme Court law only if the state court's application of law to the facts is not merely erroneous, but "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The petitioner bears the burden of showing that the state court's decision was unreasonable. *Visciotti*, 537 U.S. at 25.

## ARGUMENT

### THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION OF KIDNAPPING FOR ROBBERY

Petitioner contends there was insufficient evidence of movement to support her conviction of kidnapping for robbery in violation of Cal. Penal Code § 209(b).

Under California law, kidnapping for robbery occurs "if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim

over and above that necessarily present in the intended underlying offense." Cal. Penal Code § 209(b)(2). To determine whether the movement is incidental to the robbery, the jury must consider not only the distance, but also the "scope and nature" of the movement, as well as "the context of the environment in which the movement occurred." *People v. Rayford*, 9 Cal.4th 1, 12 (1994). The scope and nature includes the actual distance the victim was moved, but there is no minimum number of feet required to satisfy this element. *Id.* The standard "suggests a multifaceted, qualitative evaluation rather than a simple qualitative assessment." *People v. Dominguez*, 39 Cal.4th 1141, 1152 (2006).

The California Court of Appeal found sufficient evidence of movement in this case as follows:

> In the instant case, Chavez was robbed in a bathroom he voluntarily entered and then was moved outside. Ordinarily, "where a kidnapping occurs after the actual perpetration of a robbery such kidnapping may be kidnapping for the purpose of robbery if it may reasonably be inferred that the transportation of the victim was to effect the escape of the robber or to remove the victim to another place where he might less easily sound an alarm." (*People v. Monk* (1961) 56 Cal.2d 288, 295, 14 Cal. Rptr. 633.) In this case, after the taking was completed (and the take was disappointing — $ 3, a wallet, and an ATM card), defendants formed the intention of performing a second robbery at a bank ATM. The movement down the stairs, through the building, and out to Chavez's truck at the curb was for the purpose of a separate robbery, not to effectuate the initial robbery or to help the defendants escape from it. The 50 to 100 feet defendants forced Chavez to move, as he thought, at gunpoint, was "by no means an unsubstantial distance." (*People v. Jones* (1999) 75 Cal.App.4th 616, 629.)
>
> Furthermore, forcing Chavez downstairs and into his own vehicle to drive them to a different location for the commission of another crime against him under different circumstances and at a different time and place from the first robbery subjected Chavez to an increased risk of harm. There was an increased risk of harm in moving Chavez from a private room to a public street via a public stairway in a multi-unit residential building where, at 4:30 in the morning, it was likely residents would hear any commotion or outcry if Chavez's fear of defendants goaded him into taking action and Harvey, as he promised, hurt him. Chavez was forced to move while praying for guidance about whether or not to run for his life. This situation caused "a substantial increase in the risk of psychological trauma to the victim beyond that to be expected from a stationary robbery." (*People v. Nguyen*, *supra*, 22 Cal.4th at p. 886.)
>
> The further move from the relative safety of a public street with passing traffic into a private vehicle with Chavez bundled with two assailants could and did trigger a successful escape attempt, but could easily have resulted in injury to Chavez. Similar perils were possible during the intended transfer of Chavez to an ATM location at a bank in a public place which may or may not have been deserted at that hour. For example, if the defendants had been successful in forcing Chavez into the vehicle, there was a risk of an automobile accident or an injury during an escape

> attempt. (*In re Earley* (1975) 14 Cal.3d 122, 132, 120 Cal. Rptr. 881.) "The fact that these dangers did not materialize does not, of course, mean that the risk of harm was not increased." (*Ibid*.)
>
> Defendants list a number of cases (which we will not cite because they are inapposite) where short distances were found to be insufficient to support substantial movement. Unlike this case, the movements in these cases were all incidental to the commission of the robberies for which the defendants were prosecuted. There was substantial evidence in the record in this case that the movement of Chavez from the bathroom to the car was substantial, not merely incidental to the first robbery, and substantially increased the risk of harm to Chavez.

Exh. 6 at 7-9.

Evidence is constitutionally sufficient to support a conviction when, upon "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original). The reviewing court must presume that the trier of fact resolved any conflicts in the evidence in favor of the prosecution, and must defer to that resolution. *Id*. at 326. The relevant inquiry is not whether the evidence excludes every hypothesis except guilt. *Id*. "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *United States v. Jackson*, 72 F.3d 1370, 1381 (9th Cir. 1995). This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson* at 324 n. 16.

Further, under AEDPA, the question is whether the state court's application of the *Jackson* standard was objectively unreasonable. *Juan H. v. Allen,* 408 F.3d 1262, 1274-1275 (9th Cir. 2005). That inquiry is governed by 28 U.S.C. § 2254(d)(1) rather than § 2254(d)(2). *Sarausad v. Porter*, 479 F.3d 671, 677-678 (9th Cir. 2007).

Here, the state court reasonably concluded that, under the definition of movement required for kidnapping in California, there was sufficient evidence to support the conviction. Petitioner and her cohort Harvey moved victim Chavez 50-100 feet by forcing him down the stairs, through the building, and out to his truck, which the state court found was not an "unsubstantial distance." Further, by directing Chavez to drive them to a different location, petitioner and Harvey substantially increased the risk of harm to Chavez, including psychological harm beyond that expected from a stationary robbery, regardless whether such dangers actually materialized. Chavez

also faced increased risk from the possibility of injury during an escape attempt, regardless whether such injury actually occurred. Under these circumstances, it was clearly reasonable to conclude that the movement was not merely incidental to the initial robbery. The state court's application of the *Jackson* standard was not objectively unreasonable.

## CONCLUSION

Accordingly, respondent respectfully requests that the petition for writ of habeas corpus be denied.

Dated: November 20, 2007

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

GERALD A. ENGLER
Senior Assistant Attorney General

GREGORY A. OTT
Deputy Attorney General


/s/   PEGGY S. RUFFRA
Supervising Deputy Attorney General

Attorneys for Respondent

PSR/cfl
SF2007402489
40188702.wpd

Mem. of Points and Auth. in Support of Answer - C 07-2884 SI